FILED
2016 Jul-29  PM 03:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| STATE OF ALABAMA, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.:  2:16-cv-00029-JEO |
| | ) | |
| UNITED STATES OF AMERICA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

The State of Alabama and various Alabama state officials[1] (collectively referred to as "Plaintiffs") bring claims against the United States of America and various federal departments, agencies, and officials[2] (collectively referred to as "Defendants") for declaratory and injunctive relief based on Defendants' alleged failure to consult regularly with Plaintiffs regarding the placement of refugees in the State of Alabama.  (Doc. 1 ("Complaint" or "Compl.")).  This matter is now before the court on Defendants' motion to dismiss for failure to state a claim upon

---

[1] The Plaintiffs are:  State of Alabama, Stephanie McGee Azar, in her official capacity as Commissioner of the Alabama Medicaid Agency, Thomas M. Miller, M.D., in his official capacity as Acting State Health Officer, and Spencer Collier, in his Official Capacity as Secretary of the Alabama Law Enforcement Agency.

[2] The Defendants are:  United States of America, United States Department of State, John Kerry, in his official capacity as Secretary of State, Bureau of Population, Refugees, and Migration, Anne C. Richard, in her official capacity as Assistant Secretary of State, United States Department of Health and Human Services, Sylvia Burwell, in her official capacity as Secretary of Health and Human Services, Office of Refugee Resettlement, and Robert Carey, in his official capacity as Director of the Office of Refugee Resettlement.

which relief can be granted.  (Doc. 7).  The parties have fully briefed that motion (*See* Docs. 7, 19, 23, 27, 40).  Upon consideration, the court finds the motion to dismiss is due to be granted.[3]

## I.

Rule 12(b)(6), FED. R. CIV. P., authorizes a motion to dismiss an action on the ground that the allegations in the complaint fail to state a claim upon which relief can be granted.   On such a motion, the "'issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Little v. City of North Miami*, 805 F.2d 962, 965 (11th Cir. 1986) (quoting *Scheur v. Rhodes*, 416 U.S. 232, 236 (1974)).  In considering a motion to dismiss, the court assumes the factual allegations in the complaint are true and gives the plaintiff the benefit of all reasonable factual inferences.  *Hazewood v. Foundation Financial Group, LLC*, 551 F.3d 1223, 1224 (11th Cir. 2008) (per curiam).

Rule 12(b)(6) is read in light of Rule 8(a)(2), FED. R. CIV. P., which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

---

[3] This action was assigned to the undersigned United States Magistrate Judge pursuant to the court's general order of reference of actions to magistrate judges dated January 1, 2015.  The parties have since consented to the exercise of plenary jurisdiction under 28 U.S.C. § 636(c) (Doc. 10).

555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).   "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (citations, brackets, and internal quotation marks omitted).   "Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Id.*   Thus, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *i.e.*, its "factual content . . . allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted).   "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557).

## II.

This action arises from Plaintiffs' alleged concerns regarding the potential placement of Syrian refugees within the State of Alabama.   (*See* Compl. ¶¶ 26-30). After President Obama announced that 10,000 of the up to 85,000 refugees admitted to the United States during fiscal year 2016 would be from Syria,[4] and in

---

[4] The Refugee Act of 1980 provides "the number of refugees who may be admitted under this section in any fiscal year [] shall be such number as the President determines, before the beginning of the fiscal year and after appropriate consultation [with members of the Committees

response to terrorist attacks in Paris, France, Governor Robert Bentley issued Executive Order No. 14 on November 16, 2015, directing "all departments, budget units, agencies, offices, entities, and officers of the executive branch of the State of Alabama . . . to utilize all lawful means to prevent the resettlement of Syrian refugees in the State of Alabama until this order is rescinded . . . ."  (Compl. ¶¶ 28-29; Doc. 1-1 p. 5).  *See also* Presidential Determination on Refugee Admissions for Fiscal Year 2016, 80 Fed. Reg. 62433 (Sept. 29, 2015).  Governor Bentley sent the executive order to President Obama along with a letter outlining his concerns regarding the resettlement of Syrian refugees in the United States.  (Compl. ¶ 30; Doc. 1-1 pp. 2-3).

Following communications with the Obama Administration, Governor Bentley sent a letter to the White House Chief of Staff and the Principal Deputy Assistant Secretary for the Department of State on November 25, 2015, informing them "the State of Alabama has not received either voluntary consultations or quarterly reports" from the Catholic Social Services of the Greater Mobile Area ("CSS"), the nonprofit voluntary agency serving as the refugee resettlement agency in Alabama.[5]  (Compl. ¶ 31; Doc. 1-1 p. 7).  Governor Bentley expressed concern

_____

on the Judiciary of the Senate and of the House of Representatives], is justified by humanitarian concerns or is otherwise in the national interest."  8 U.S.C. § 1157(a)(2) & (e).

[5] Alabama withdrew from the state-administered Refugee Resettlement Program effective September 30, 2001.  (*See* Doc. 7-2 p. 2).  According to Plaintiffs, "the State Department has an agreement with the U.S. Conference of Catholic Bishops as a resettlement agency [in Alabama],

regarding the refugee vetting process and the lack of reporting by CSS, and he requested that the Administration direct CSS and the United States Conference of Catholic Bishops to provide the required reports and consultations "beginning immediately." (Doc. 1-1 pp. 7-8).

Governor Bentley wrote again to the White House Chief of Staff on December 2, 2015, to express his "growing frustration with the lack of answers [his] office is receiving regarding [the refugee resettlement program]." (*Id.* p. 10). In the letter, he also stated "Alabama has not received any mandated reports regarding refugees of any national origin" and reiterated his "great concerns with the refugee vetting process, particularly the lack of state involvement, oversight or knowledge." (*Id.* pp. 10-11).

Finally, on December 30, 2015, Governor Bentley wrote to the Director of Refugee Admissions for the Bureau of Population, Refugees, and Migration requesting that the U.S. Department of State "provide a tailored report for Alabama regarding refugee resettlement." (*Id.* p. 13). Specifically, he requested that the State Department provide "the total number of refugees resettled in the state broken down by nationality, age range and gender" and update the information provided on a monthly basis via a secure website. (*Id.*).

---

which, in turn, has a sub-agreement with Catholic Social Services of the Greater Mobile Area." (Compl. p. 5, n.1).

Apparently unsatisfied with the federal government's response, Plaintiffs filed this action on January 7, 2016, asking this court for declaratory and injunctive relief relating to Defendants' alleged failure to fulfill their consultation obligations under the Refugee Act.  (*See* Compl.).  Specifically, Plaintiffs seek a declaratory judgment "setting forth the parties' rights and obligations accordingly and an injunction directing Defendants to fulfill their statutory obligations" under the Refugee Act.  (*Id.* ¶ 38).  Plaintiffs also ask the court for an order compelling Defendants to comply with their statutory consultation obligations under the Refugee Act.  (*Id.* ¶¶ 42 & 48).

## III.

Plaintiffs assert three claims for declaratory and injunctive relief against Defendants under the Declaratory Judgment Act, the Refugee Act, the Administrative Procedures Act, and the Mandamus and Venue Act.  As discussed below, each of Plaintiffs' three claims fails to state a claim for which relief may be granted because (1) there is no private right of action to enforce the Refugee Act, (2) the consultation required is not an agency action under the Administrative Procedures Act, and (3) Plaintiffs do not have a clear right to relief and Defendants do not owe them a clear ministerial duty.  Accordingly, Defendants' motion to dismiss is due to be granted.  Because some understanding of the Refugee Act is helpful to understanding the issues raised by Defendants' motion, the court will

first briefly discuss the statutory background of the Act before addressing Plaintiffs' claims and Defendants' motion to dismiss.

### A. Statutory Background

"The authority to control immigration . . . is vested solely in the Federal government." *Takahashi v. Fish and Game Comm'n*, 334 U.S. 410, 416 (1948) (citation omitted).  Pursuant to that power, Congress enacted the Refugee Act of 1980, which amended the Immigration and Nationality Act, to "provide a permanent and systematic procedure for the admission [] of refugees of special humanitarian concern to the United States, and to provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted."  Refugee Act of 1980, Pub. L. No. 96-212 § 101(b).  The Refugee Act establishes the Office of Refugee Resettlement ("ORR") within the Department of Health and Human Services and authorizes the Director of ORR "to make grants to, and contracts with, public or private nonprofit agencies for initial resettlement of refugees in the United States."  8 U.S.C. §§ 1521 & 1522(b)(1)(A).  Additionally, the Director of ORR is authorized to provide assistance and reimbursement to States for the cost of cash and medical assistance provided to refugees during the refugees' first three years in the United States.  *Id.* at § 1522(e)(1).

7

The Refugee Act outlines a framework for cooperation between the federal government, states, and nonprofit agencies for resettling refugees in the United States.  The Act states "[i]t is the intent of Congress that in providing refugee assistance under this section . . . local voluntary agency activities should be conducted in close cooperation and advance consultation with State and local governments."  *Id.* at § 1522(a)(1)(B)(iii).  The Act also provides that the "Director [of ORR] and the Federal agency administering [grants to and contracts with nonprofit agencies for the initial resettlement of refugees] shall consult regularly [] with State and local governments and private nonprofit voluntary agencies concerning the sponsorship process[6] and the intended distribution of refugees among the States and localities before their placement in those States and localities."  *Id.* at § 1522(a)(2)(A).  Additionally, the Act requires the Director of ORR to "develop and implement, in consultation with representatives of voluntary agencies and State and local governments, policies and strategies for the placement and resettlement of refugees" and provides that "[w]ith respect to the location of placement of refugees within a State, the Federal [government] shall, consistent with such policies and strategies and to the maximum extent possible, take into account recommendations of the State."  *Id.* at § 1522(a)(2)(B) & (D).

---

[6] The sponsorship process is the process through which resettlement agencies commit to providing assistance to newly arrived refugees in the United States.  (Doc. 7-1 p. 12) (citing U.S. Dept. of State, Bureau of Population, Refugees, and Migration Fact Sheet, Refugee Resettlement in the United States (Sept. 16, 2010)).

**B. There is no private right of action under the Refugee Act.**

In Count I of their Complaint, Plaintiffs seek declaratory and injunctive relief under the Declaratory Judgment Act based on Defendants' alleged violation of the Refugee Act. (Compl. ¶¶ 35-38). Plaintiffs assert Defendants violated the Refugee Act by failing to consult with Alabama as required by the Act. (*Id.* at ¶ 37). The violation of a federal statute, however, "does not automatically give rise to a private cause of action in favor of [the person harmed by the violation]." *Alabama v. PCI Gaming Authority*, 801 F.3d 1278, 1293-94 (11th Cir. 2015) (quoting *Cannon v. Univ. of Chicago*, 441 U.S. 677, 688 (1979)). Instead, "private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) (citing *Touche Ross & Co. v. Redington*, 442 U.S. 560, 578 (1979)). "A statute may . . . create a cause of action either expressly or by implication." *PCI Gaming Authority*, 801 F.3d at 1294 (citation omitted).

The Refugee Act does not contain an express provision granting a federal cause of action to enforce the provisions of the Act. *See* 8 U.S.C. §§ 1521-1524. Thus, the Refugee Act does not expressly create a private right of action.[7] *See PCI Gaming Authority* at 1294 (quoting *Smith v. Russellville Prod. Credit Ass'n*, 777

---

[7] Plaintiffs do not dispute the Refugee Act does not contain an express private right of action. (*See* doc. 19 at 7-12)

F.2d 1544, 1547 (11th Cir. 1985). The question before this court, therefore, is whether the Refugee Act creates an implied right of action.[8]

"In determining whether a statute gives rise to an implied right of action, '[t]he judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy.'" *Id.* (quoting *Love v. Delta Air Lines*, 310 F.3d 1347, 1352 (11th Cir. 2002) (quoting in turn *Sandoval*, 532 U.S. at 286). "Congressional intent to create a private right of action will not be presumed. There must be clear evidence of Congress's intent to create a cause of action." *McDonald v. Southern Farm Bureau Life Ins. Co.*, 291 F.3d 718, 723 (11th Cir. 2002) (quotation omitted). "In the absence of congressional intent to create an implied right of action, 'a cause of action does not exist, and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute.'" *PCI Gaming Authority*, 801 F.3d at 1294 (quoting *Love*, 310 F.3d at 1352) (quoting in turn *Sandoval*, 532 U.S. at 286-87) (internal alteration omitted).

The Eleventh Circuit articulated a three-part inquiry for determining if Congress intended to create an implied private right of action. *See PCI Gaming Authority*, 801 F.3d at 1295; *Love*, 310 F.3d at 1352-53. "[F]irst and foremost,

---

[8] The parties dispute whether an implied right of action may be asserted against the federal government. (*See* docs. 23, 27, 32, 34, 38, 40). Because the court concludes the Refugee Act does not create an implied right of action, the court need not and does not address the issue.

[courts] look to the statutory text for 'rights-creating' language." *PCI Gaming Authority*, 801 F.3d at 1295 (quoting *Love*, 310 F.3d at 1352) (quoting in turn *Sandoval*, 532 U.S. at 288). "Second, [courts] examine the statutory structure within which the provision in question is embedded." *PCI Gaming Authority*, 801 F.3d at 1295 (quoting *Love*, 310 F.3d at 1353). Finally, "if—and only if—statutory text and structure have not conclusively resolved whether a right of action should be implied," courts look to the legislative history of the statute in question. *Id.* (quoting *Love*, 310 F.3d at 1353) (internal quotation and alteration omitted). *See also Sandoval*, 532 U.S. at 288 ("[L]egal context matters only to the extent it clarifies text.").

### 1. Rights-creating language

"[T]he right- or duty-creating language of the statute has generally been the most accurate indicator of the propriety of implication of a cause of action." *Cannon v. Univ. of Chicago*, 441 U.S. 677, 690, n.13 (1979). "Where a statute does not include this sort of explicit 'right- or duty-creating language', [the Supreme Court] rarely impute[s] to Congress an intention to create a private right of action." *Gonzaga University v. Doe*, 536 U.S. 273, 284 n.3 (2002) (citations omitted).

"'Rights-creating language' is language 'explicitly conferring a right directly on a class of persons that includes the plaintiff in a case,' [] or language identifying

'the class for whose especial benefit the statute was enacted.'"  *Love*, 310 F.3d at 1352 (internal citation and alteration omitted).  For example, the Supreme Court found a statute "decree[ing] that 'no person shall be subjected to discrimination'" contains rights-creating language, and, therefore, creates an implied right of action. *Sandoval*, 532 U.S. at 289-90 (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677, 690, n.13 (1979) & 42 U.S.C. § 2000d-1) (internal alterations omitted).  Similarly, the Eleventh Circuit found a provision in the Americans with Disabilities Act stating "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter" contains rights-creating language.  *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1167 (11th Cir. 2003) (quoting 42 U.S.C. § 12203(a)) (emphasis omitted).  On the other hand, "a statute that merely describes how the federal government will effectuate or enforce rights does not contain rights-creating language." *PCI Gaming*, 801 F.3d at 1297 (citing *Sandoval*, 532 U.S. at 288-89).  Additionally, the Supreme Court found a statute "phrased as a directive to federal agencies engaged in the disbursement of public funds" does not contain rights-creating language. *Universities Research Ass'n, Inc. v. Coutu*, 450 U.S. 754, 772 (1981) (finding the language in § 1 of the Davis-Bacon Act, which requires certain federal contracts to contain a provision stating the minimum wages to be paid to mechanics and laborers, "does not confer rights directly on those individuals . . . [and] provides no

12

support for the implication of a private remedy") (quoting *Cannon*, 441 U.S. at

693, n. 14).

The provision of the Refugee Act at issue here is phrased as a command to

the Director of ORR and the federal agency administering initial resettlement

assistance under the Act:

> The Director and the Federal agency administering [initial
> resettlement assistance under the Refugee Act] shall consult regularly
> (not less often than quarterly) with State and local governments and
> private nonprofit voluntary agencies concerning the sponsorship
> process and the intended distribution of refugees among the States and
> localities before their placement in those States and localities.

8 U.S.C. § 1522(a)(2)(A).  Although § 1522(a)(2)(A) refers to the State and

requires the Director and federal agency to consult with the State, it does not speak

directly to the State.  Rather, the provision's reference to the State is made in the

context of describing how the federal government must carry out its obligations

under the Act.  Accordingly, the language of the statute does not indicate "an

unmistakable focus on the benefitted class."  *Coutu*, 450 U.S. at 772.  Moreover,

even if the federal government's consultation obligation under § 1522(a)(2)(A) is

meant to benefit the State, that alone is not enough to show the statute contains

rights-creating language or implies a private right of action.  *See id.* at 771 ("[T]he

fact that an enactment is designed to benefit a particular class does not end the

inquiry; instead it must also be asked whether the language of the statute indicates

that Congress intended that it be enforced through private litigation.") (citation

13

omitted).   Indeed, the language in § 1522(a)(2)(A) is similar to language in a statute the Eleventh Circuit found not to contain rights-creating language.

In *Arrington v. Helms*, 438 F.3d 1336 (11th Cir. 2006), the Eleventh Circuit addressed, among other things, whether 42 U.S.C. § 657, a section of the Social Security Act, contains rights creating language.   *Id.* at 1345-46.   Section 657 describes how a State must distribute child support payments collected by the State on behalf of families, and the section repeatedly states "the State shall . . . pay to the family."   *See* 42 U.S.C. § 657.   The Eleventh Circuit noted "§ 657's language speaks only to the states," and "does not speak directly to individual [families]." *Arrington*, 438 F.3d at 1346.   Additionally, the Court found the statute did not focus on the needs of any individual family, but instead only refers to the individual families "to explain how the state generally must distribute child support funds."   *Id.*   Accordingly, the Eleventh Circuit held § 657 does not contain rights-creating language.   *Id.*

Based on the Eleventh Circuit's reasoning in *Arrington*, the Refugee Act does not contain the rights-creating language that is generally required to show Congress's intent to create an implied private right of action.   *See Delancey v. City of Austin*, 570 F.3d 590, 594 (5th Cir. 2009) (finding a statute requiring a federal agency to provide certain advisory services to displaced persons did not contain rights-creating language and did not create an implied right of action in favor of

14

the displaced persons); *Texas Health and Human Services Comm'n v. United States of America*, No. 15-cv-3851, Order at 7-9 (N.D. Tex. June 16, 2016) (finding the Refugee Act does not contain rights-creating language).  Nothing in Plaintiffs' opposition brief compels a different result.

Plaintiffs argue "§ 1522(a)(2)(A)'s focus is on 'the [S]tates themselves,'" and, therefore, the statute contains rights-creating language.  (Doc. 19 at 8).  That argument, however, is at odds with the language of § 1522(a)(2)(A), which refers to the States only to explain how the federal government must carry out its obligations under the Act.  Plaintiffs' argument is also not supported by Eleventh Circuit case law.  As discussed above, the Eleventh Circuit has found that a statute may refer to a class of persons or entities and require the government to take action relative to those persons or entities, but still not contain rights-creating language. *See Arrington*, 438 F.3d at 1345 ("[E]ven though [the statute] contain[s] language requiring the state to take certain actions relative to individual foster children (e.g., the State shall file a petition [to terminate the parental rights of the child's parents], we determined [the statute] do[es] not have the kind of focused-on-the-individual, rights-creating language required by *Gonzaga*.") (quoting *31 Foster Children v. Bush*, 329 F.3d 1255, 1272 (11th Cir. 2003)).  *See also Coutu*, 450 U.S. at 771-73 (recognizing § 1 of the Davis-Bacon Act is "a minimum wage law designed for the

15

benefit of construction workers," but finding the Act does not contain rights-creating language).

Next, the present case is distinguishable from *Gregoire v. Rumsfeld*, 463 F.Supp. 2d 1209 (W.D. Wash. 2006), the case Plaintiffs rely upon to argue Alabama has a right to enforce its consultation rights against the federal government.   In *Gregoire*, the Governor of Washington sought to enjoin the Secretary of Defense from implementing the Defense Base Closure and Realignment Commission's recommendations regarding Washington's Air National Guard, arguing implementation of the recommendations would violate 32 U.S.C. § 104.   *Id.* at 1213.   Among the issues the district court addressed was whether a private right of action exists under § 104.   The district court concluded there is a private right of action under the statute in part because the Governor was "one of the class for whose especial benefit the statute was enacted."   *Id.* at 1223-24 (quotation omitted).   § 104 gives governors "power to consent or withhold [their] consent to changes in the 'branch, organization or allotment of a [National Guard] unit'" by stating, "no change in the branch, organization, or allotment of a unit located entirely within a State may be made without the approval of its governor."   *Id.* at 1214-15, 1223 (quoting 32 U.S.C. § 104).   No similar language is found in the Refugee Act; indeed, the legislative history of the Act shows the Act's consultation provision is "not intended to give States [] any veto power over

refugee placement decisions." 8 U.S.C. § 1522; H.R. Rep. No. 132, 99th Cong., 1st Sess., 19 (1985). Accordingly, the statute addressed by the district court in *Gregoire* is markedly different from the Refugee Act, and *Gregoire* does not persuade this court that the Refugee Act contains rights-creating language or creates an implied right of action.

2. <u>The statutory structure</u>

The statutory structure also contains no indication Congress intended to create a private right of action for the States under the Refugee Act. As an initial matter, within the Immigration and Nationality Act, which the Refugee Act amended, Congress has expressly authorized judicial review of certain federal actions. *See* 8 U.S.C. § 1252(b) (authorizing judicial review of final orders of removal). When "Congress creates a comprehensive statutory scheme with express provision for private enforcement in certain circumstances, 'it is highly improbable that Congress absentmindedly forgot to mention an intended private action.'" *Texas Health and Human Services Comm'n v. United States of America*, No. 15-cv-3851, Order at 9 (N.D. Tex. June 16, 2016) (quoting *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 20 (1979)). Thus, the presence of an express cause of action in the Immigration and Nationality Act weighs against finding an implied right of action in the Refugee Act.

Next, although the Refugee Act contains several sections outlining a framework for cooperation between the federal government and the States, *see supra* p. 8 & Doc. 19 pp. 11-12, the Act focuses on the system-wide provision of resettlement assistance to refugees.  *See* 8 U.S.C. § 1522.  The Act does not focus on the needs of the States.  Accordingly, the structure of the Refugee Act does not support the implication of a private right of action for the States to enforce the Act.  This is especially true within the broader context of the nation's immigration laws, which grant the federal government with exclusive authority to control immigration.  *See, e.g., Takahashi*, 334 U.S. at 416 & 19 (citation omitted).  Given the balance of power between the federal government and the States relating to immigration, the court finds it highly unlikely that Congress would have intended to create a private right of action for the States to enforce the Refugee Act without expressly providing for one.

### 3. The legislative history

Plaintiffs assert the legislative history of the Refugee Act supports the implication of a private right of action.  (Doc. 19 pp. 13-18).  Although courts should generally refrain from considering legislative history when, as here, the statutory text and structure are conclusive, *see PCI Gaming Authority*, 801 F.3d at 1295, the court notes that the legislative history of the Refugee Act contains no reference to a private right of action to enforce the Act and finds that the Act's

legislative history does not support the implication of a right of action in favor of the States. *See* S. Rep. No. 96-256; S. Rep. 97-638; H.R. Rep. No. 99-132. Although Congress amended the Refugee Act and specifically addressed the federal government's consultation obligations under the Act in both 1982 and 1986, Congress did not mention the possibility of a right of action for States to enforce those obligations, much less amend the Refugee Act to include an express right of action. *See id.*  Indeed, in amending the Act to strengthen the federal government's consultation requirements, "[t]he Committee emphasize[d] that these requirements are not intended to give States and localities any veto power over refugee placement decisions, but rather to ensure their input into the process and to improve their resettlement planning capacity." H.R. Rep. 99-132 at 19.  Thus, the legislative history does not support Plaintiffs' argument that Congress intended an implied right of action to enforce the Refugee Act.

The court finds nothing in the statutory text, structure, or legislative history to show Congress intended to create a right of action in favor of the States to enforce the Refugee Act.  Thus, the court concludes there is no implied right of action under the Act.  Because Plaintiffs have no right of action under the Refugee Act, the Declaratory Judgment Act provides them no basis for the relief they seek in Count I. *See Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950) ("The operation of the Declaratory Judgment Act is procedural only.  [] Congress

enlarged the range of remedies available in the federal courts but did not extend their jurisdiction.") (internal citation, alteration and quotation marks omitted).  (*See also* Compl. ¶¶ 35-38).  As a result, Count I is due to be dismissed with prejudice.

### C. APA

In Count II of their Complaint, Plaintiffs assert a claim for declaratory and injunctive relief under the Administrative Procedures Act ("APA").  (Compl. ¶¶ 39-43).  The APA "authorizes suit by '[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute.'"  *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 61 (2004) (quoting 5 U.S.C. § 702) (alteration in original).  The APA defines "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13).  Based on this definition, courts have held "agency action" under the APA does not encompass everything an agency does, but is limited to circumscribed, discrete actions.  *See Norton*, 542 U.S. at 62; *Fund for Animals, Inc. v. BLM*, 460 F.3d 13, 19-20 (D.C. Cir. 2006).  Additionally, the Supreme Court found "[t]he final term in the definition, 'failure to act,' is [] properly understood as a failure to take an *agency action*—that is, a failure to take one of the agency actions [] earlier defined in § 551(13)."  *Norton*, 542 U.S. at 62 (emphasis in original).

When a plaintiff challenges a federal agency's failure to act, "[t]he reviewing court shall [] compel agency action unlawfully withheld or unreasonably delayed."[9]  5 U.S.C. § 706(1).  However, a claim challenging an agency's failure to act "can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take."  *Norton*, 542 U.S. at 64 (emphasis in original omitted).  Thus, the Supreme Court recognized "[f]ailures to act are sometimes remediable under the APA, but not always."  *Id.* at 61.

The Refugee Act requires Defendants to "consult regularly (not less often than quarterly) with State and local governments . . . before [the refugees'] placement in those States and localities."  8 U.S.C. § 1522(a)(2)(A).  Plaintiffs assert "Defendants' obligations . . . to consult on a regular basis and in advance with the State of Alabama . . . constitute agency action unlawfully withheld and unreasonably delayed under 5 U.S.C. § 706(1)," and ask the court to compel Defendants to comply with their obligation to consult with Alabama.  (Compl. ¶ 42).[10]

---

[9] The APA "empowers a court only to compel an agency 'to perform a ministerial or non-discretionary act,' or 'to take action upon a matter, without directing *how* it shall act.'"  *Norton*, 542 U.S. at 64 (quoting Attorney General's Manual on the Administrative Procedure Act 108 (1947)) (emphasis in original).

[10] Plaintiff also assert Defendants' "failure to consult on a regular basis and in advance with the State of Alabama . . . constitutes agency action that is arbitrary, capricious, or otherwise unlawful under 5 U.S.C. § 706(2)."  (Compl. ¶ 43).  Because Plaintiffs' allegation under § 706(2) is based upon Defendants' alleged failure to act, it is simply a restatement of Plaintiffs' claim under § 706(1).

The regular, advance consultation required by the Refugee Act is not "a rule, order, license, sanction, relief, or the equivalent or denial thereof," nor is it a circumscribed, discrete action.  Instead, as the Northern District of Texas found, "it is best understood as an ongoing, dynamic process."  *Texas Health and Human Services Comm'n v. United States of America*, No. 15-cv-3851, Order at 10 (N.D. Tex. Feb. 8, 2016).    Indeed, the ongoing communication required by § 1522(a)(2)(A) is simply part of "the common business of managing government programs."   *See Fund for Animals, Inc.*, 460 F.3d at 20.  As such, it is akin to "prepar[ing] proposals, conduct[ing] studies, and meet[ing] with members of Congress and interested groups," all of which are activities that do not generally constitute agency action, *see id.* at 19-20, and this court concludes Defendants' consultation obligation is not an agency action within the meaning of the APA.

The cases Plaintiffs rely on to argue Defendants' failure to consult with the State is a failure to act under the APA do not lead to a different conclusion.  First, in *Salmon Spawning & Recovery Alliance v. U.S. Customs & Border Protection*, 550 F.3d 1121 (Fed. Cir. 2008), the Federal Circuit addressed the issue of standing; it did not analyze if regular, ongoing consultation constitutes agency action within the meaning of the APA.  550 F.3d at 1130-32.  Likewise, *California Wilderness Coalition v. U.S. Dept. of Energy*, 631 F.3d 1072 (9th Cir. 2011), did not address if regular, ongoing consultation is an agency action. Rather, in *California*

*Wilderness*, the plaintiffs challenged a Department of Energy order designating national interest electric transmissions corridors, and the agency action at issue was the entry of the designation order and not the Department's failure to consult with affected states.  *Id.* at 1079-80 & 1085-96.

Because the regular consultation required by the Refugee Act is not an agency action under the APA, Plaintiffs have failed to state a claim under the APA for which relief may be granted.  Thus, Count II of Plaintiffs' Complaint is due to be dismissed with prejudice.

### D. Mandamus

Finally, in Count III of their Complaint, Plaintiffs ask this court to issue a writ of mandamus "compelling Defendants to comply with their statutory duties" to consult with the State.  (Compl. ¶¶ 44-48).  This court has "jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."  28 U.S.C. § 1361.  "[M]andamus is a 'drastic' remedy, 'to be invoked only in extraordinary situations.'"  *U.S. v. Salmona*, 810 F.3d 806, 811 (11th Cir. 2016) (quoting *Kerr v. U.S. Dist. Ct. for the N. Dist. of Cal.*, 426 U.S. 394, 402 (1976)); *see also Cash v. Barnhart*, 327 F.3d 1252, 1257 (11th Cir. 2003) ("Mandamus is an extraordinary remedy which should be utilized only in the clearest and most compelling of cases.") (quotation and internal alteration omitted).

As an initial matter, "[m]andamus relief is appropriate only when [] there is no other adequate remedy." *Salmona*, 810 F.3d at 811 (quoting *Cash*, 327 F.3d at 1258); *see also Hollywood Mobile Estates Ltd. v. Seminole Tribe of Florida*, 641 F.3d 1259, 1268 (11th Cir. 2011). Defendants first argue Plaintiffs fail to state a claim for mandamus relief because an alternative remedy is available to them, namely mandatory injunctive relief under the APA. (Doc. 7-1, p. 26). However, injunctive relief is not available to Plaintiffs under the APA when, as here, there is no agency action. *See supra* pp. 20-23. Accordingly, Defendants' first argument to dismiss Plaintiffs' mandamus claim misses the mark, and this court declines to hold that Plaintiffs are categorically barred from seeking mandamus relief on the ground that an alternative remedy is available under the APA.

Even when a plaintiff has no alternative remedies, mandamus relief is only available if "the 'plaintiff has a clear right to the relief requested' (in other words, the defendant must have 'a clear duty to act')." *Salmona*, 810 F.3d at 811 (quoting *Cash*, 327 F.3d at 1258). To have a clear right to the relief requested, a plaintiff's right to relief must be "indisputable." *Id.*, 810 F.3d at 811 (citing *Kerr*, 426 U.S. at 403). Additionally, mandamus relief is only available when "a government officer owes [a plaintiff] a legal duty that is a specific, ministerial act, devoid of the exercise of judgment or discretion." *Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, 112 F.3d 1283, 1288 (5th Cir. 1997) (citation omitted); *see also*

24

*Norton*, 542 U.S. at 63 ("The mandamus remedy was normally limited to enforcement of a specific unequivocal command, [] the ordering of a precise, definite act about which an official had no discretion whatever.") (citations and internal quotation marks and alterations omitted); *Kirkland Masonry, Inc. v. C.I.R.*, 614 F.2d 532, 534 (5th Cir. 1980) ("Section 1361 [] confers jurisdiction on a district court only when the defendant official or agency owes a specific duty to the plaintiff. . . . The duty must be 'clear, ministerial and non-discretionary.'") (citations omitted);[11] *Gilbert Equip. Co., Inc. v. Higgins*, 709 F.Supp. 1071, 1089 (S.D. Ala. 1989) ("[Mandamus] will issue only if the act to be compelled is ministerial and so plainly prescribed as to be free from doubt.") (citation and internal quotation marks omitted).

Plaintiffs' allegations do not show they are entitled to mandamus relief. Plaintiffs first allege the "consultation [required by the Refugee Act] has not occurred" and Defendants have failed to fulfill their "consultation obligations to Alabama" under the Act. (Compl. ¶¶ 2, 9-16). Those allegations, however, are simply "'naked assertions' devoid of 'further factual enhancement,'" and as such, they are not sufficient to survive a motion to dismiss or show Plaintiffs have an indisputable right to relief. *See Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S.

---

[11] In *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit announced prior to October 1, 1981.

at 557).  Likewise, Plaintiffs' allegations Defendants failed to "consult adequately" and provide them with "adequate" or "sufficient information about the refugees" and "denied the State a meaningful role and input into the process of resettlement of those refugees" are vague and conclusory statements that do not give Plaintiffs an indisputable right to relief.  *Id.*  (*See also* Compl. ¶¶ 23, 37, 42 & 43).

Plaintiffs' remaining allegations regarding Defendants' alleged failure to consult do not fare any better.  Specifically, Plaintiffs allege:

> Defendants have breached their consultation duties and obligations . . . by (2) failing to provide Alabama with information necessary to assess security and other potential risks posed by refugees . . . ; and (3) failing to provide Alabama with information necessary to adequately plan and prepare for the arrival of refugees in the State in regard to security and requests for social services and public assistance.

(Compl. ¶ 37).  Additionally, Plaintiffs request:

> A declaration that [Defendants'] consultation duties and obligations include:  (1) disclosure of sufficient information about the refugees who have been settled or will be settled within the State of Alabama so the State may consult with the federal government, assess security and other potential risks posed by refugees, and adequately plan for the arrival of refugees within its borders, including in regard to security and requests for social services and public assistance; (2) [] production of the federal government's entire file on each refugee complete with medical history and the basis to support Medicaid eligibility so the Alabama Medicaid Agency may appropriately oversee medical assistance as part of the federal government's refugee resettlement program; (3) a certification by the Secretary of State . . . that those refugees pose no security risk; and (4)  allowing the State a meaningful role and input into the process of resettlement of those refugees.

(Compl. p. 14, ¶ B).  Nothing in Plaintiffs' allegations or request for relief show they have a clear right to relief.  Nothing in the Refugee Act requires Defendants to provide Plaintiffs with "information necessary to assess security and other potential risks posed by refugees" or "information necessary to adequately plan and prepare for the arrival of refugees in the State in regard to security and requests for social services and public assistance."   *See* 8 U.S.C. § 1522; Compl. ¶ 37.  Moreover, nothing in the Act requires Defendants to provide Plaintiffs with information about individual refugees to be resettled in the State, the federal government's "entire file" on each refugee, or a certification that a refugee "pose[s] no security risk."   *See* 8 U.S.C. § 1522; Compl. p. 14 ¶ B.  Instead, the Refugee Act only requires the federal government to consult with the States regarding the "sponsorship process and the intended distribution of refugees among the States and localities."   8 U.S.C. § 1522(a)(2)(A).   Thus, Plaintiffs' allegations do not show they have an indisputable right to relief.

Plaintiffs' mandamus claim also fails because mandamus is only available when a defendant owes a plaintiff a clear, ministerial duty.  *Kirkland Masonry,* 614 F.2d at 534 (citation omitted).  A ministerial duty is "a duty that is so plain in point of law and so clear in matter of fact that no element of discretion is left to the precise mode of its performance."  *See Ministerial*, BLACK'S LAW DICTIONARY 1146 (10th Ed. 2014).  Here, the consultation required by the Refugee Act is not a

ministerial duty because there is an element of discretion regarding how Defendants could perform the required consultations with the States.  By the same token, what constitutes adequate, sufficient, or meaningful consultation with the States necessarily involves the exercise of judgment and discretion; therefore, Plaintiffs' vague allegations that Defendants failed to adequately consult with them, provide them with sufficient information, or allow them a meaningful role in the resettlement of refugees within the State do not show Defendants owe them a clear, ministerial duty.

Plaintiffs' allegations do not show that they have a clear, indisputable right to the relief they seek or that Defendants owe them a clear, ministerial duty.  As a result, Plaintiffs have not stated a plausible claim for mandamus relief, and Count III of the Complaint is due to be dismissed with prejudice.

## IV.

Based on the foregoing, Defendants' motion to dismiss for failure to state a claim (Doc. 7) is due to be **GRANTED** and Plaintiffs' claims are due to be **DISMISSED WITH PREJUDICE**.

**DATED** this 29th day of July, 2016.

_____
**JOHN E. OTT**
Chief United States Magistrate Judge

28